Argued and submitted March 31, 2010; on respondent's motion to dismiss and motion to strike filed March 12, appellant's response to respondent's motion to dismiss filed April 7, and respondent's reply to motion to dismiss and motion to strike filed April 16, 2008, motions to dismiss appeal and to strike trial court's order granting prejudgment interest denied; affirmed on appeal and on cross-appeal October 20, 2010, petition for review denied March 25, 2011 (350 Or 130)

MAY TRUCKING COMPANY,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

NORTHWEST VOLVO TRUCKS, INC.,
an Oregon corporation;
and TEC Equipment, Inc.,
an Oregon corporation,
*Defendants,*
*and*

VOLVO TRUCKS NORTH AMERICA, INC.,
a Delaware corporation,
*Defendant-Respondent*
*Cross-Appellant.*

NORTHWEST VOLVO TRUCKS, INC.,
an Oregon corporation;
and TEC Equipment, Inc.,
an Oregon corporation,
*Cross-Claim Plaintiffs,*

*v.*

VOLVO TRUCKS NORTH AMERICA, INC.,
a Delaware corporation,
*Cross-Claim Defendant.*

Marion County Circuit Court
03C17564; A136410

241 P3d 729

Gordon T. Carey, Jr., argued the cause and filed the briefs for appellant-cross-respondent.

David M. Jacobson argued the cause for respondent-cross-appellant. With him on the briefs were James R. Hermsen and Dorsey & Whitney LLP.

Before Landau, Presiding Judge, and Ortega, Judge, and Sercombe, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

This is a case about unsuccessful negotiations for the sale of a large number of trucks and the intersection between the seventeenth-century statute of frauds and twenty-first century electronic mail. Along the way, there are allegations of breach of contract and the fabrication of documents, as well as issues of equitable estoppel, prejudgment interest, and appellate procedure.

By way of introduction to this civil litigation morass, we begin with the following summary. Plaintiff May Trucking Company needed to purchase a number of new trucks. It negotiated with a truck manufacturer, defendant Volvo Trucks North America, Inc. (VTNA), and with two of its dealers, defendants Northwest Volvo Trucks, Inc., and TEC Equipment, Inc. (collectively, TEC). The negotiations transpired orally and by email. VTNA eventually decided not to sell its trucks, but, by the time it did so, enough emails had been transmitted to convince plaintiff that it had a deal. Plaintiff sued both TEC and VTNA for breach of contract. VTNA responded that plaintiff had fabricated documents to support its claim and moved to dismiss. The trial court denied the motion. VTNA then moved for summary judgment based on the statute of frauds. This time, the trial court granted VTNA's motion and dismissed VTNA from the case.

Plaintiff went to trial against TEC and prevailed with a $3.14 million verdict, plus prejudgment interest. TEC and plaintiff settled, agreeing to defer the issue of prejudgment interest; TEC then paid plaintiff everything but the interest. In the meantime, plaintiff appealed the dismissal of VTNA. Shortly after that, the trial court entered an order awarding prejudgment interest on the settlement with TEC.

On appeal, plaintiff contends that the trial court erred in concluding that the contract with VTNA failed for want of compliance with the statute of frauds. VTNA, meanwhile, cross-appeals the denial of its motion to dismiss based on plaintiff's supposed fabrication of documents. VTNA also has filed two motions in this court. First, it moves to strike the trial court's entry of an order awarding prejudgment interest because the order was entered after the filing of the notice of appeal. Second, VTNA moves to dismiss the appeal on the ground that, plaintiff having satisfied its judgment

against TEC, the claim has been extinguished with respect to all obligors under the supposed contract. In the alternative, VTNA argues that plaintiff cannot maintain this appeal because the appeal puts at risk the judgment against TEC from which plaintiff already has received substantial benefit.

We conclude that the trial court did not err in dismissing VTNA on statute of fraud grounds. We also conclude that the trial court correctly denied VTNA's motion to dismiss. Finally, we deny both of VTNA's motions. We therefore affirm on the appeal and the cross-appeal.

## I.  FACTS

Because different standards of review are implicated by the appeal, the cross-appeal, and the motions, we state the facts pertinent to each separately.

### A.  *The Appeal: Contract Negotiations*

The appeal pertains to the trial court's decision to grant VTNA's motion for summary judgment concerning the question whether the parties had negotiated an enforceable contract. We state the facts in the light most favorable to plaintiff, the nonmoving party.

Plaintiff is an over-the-road carrier that, at the time of the trial, operated a fleet of some 750 tractor trucks in the lower 48 states. As with any carrier, plaintiff was required periodically to replace trucks in its fleet. TEC sold new and used tractor trucks, including Volvo tractor trucks manufactured by VTNA.

In early 2003, plaintiff, TEC, and VTNA began negotiations for the purchase and sale of 499 new tractor trucks over a period of three and one-half years. Detailed discussions continued through mid-July. VTNA participated in a number of the meetings and email exchanges between plaintiff and its dealers, TEC. VTNA and TEC, meanwhile, had their own negotiations about the extent to which VTNA would commit to providing a certain number of trucks at a guaranteed price.

At the end of May, representatives of each of the parties met to see if they could "close the deal." Marvin May, representing plaintiff, said that he needed a reduced purchase price of $89,000 per tractor. Richard Bell, representing

VTNA, replied that he would have to check with VTNA's headquarters. He spoke with headquarters and confirmed that VTNA could give rebates sufficient to reduce the price. On July 15, 2003, Jeff Strong, of TEC, emailed Bell asking for written confirmation of VTNA's commitment to TEC, so that TEC could make an offer to plaintiff.

On July 16, Bell replied by email with a summary of what he saw as the principal components of the deal and confirming VTNA's quantity and pricing commitments. Bell recommended that, "upon a signed agreement with the customer," TEC place orders with VTNA for the next two calendar years. Bell added that "VTNA's support for this transaction is to TEC Equipment not the customer. You will have to prepare your agreement with May Trucking based upon the support we are providing you." The emails between Bell and Strong were sent only between representatives of VTNA and TEC; none were sent to plaintiff.

Strong and representatives of plaintiff then exchanged draft forms of a proposed contract. On July 18, 2003, Strong sent a letter to May setting out what he believed to be the terms of the agreement. Notwithstanding Bell's instruction to Strong in his July 16 email that the contract be between plaintiff and TEC, Strong's letter described the agreement as one among three parties: plaintiff, TEC, and VTNA. On that same date, Strong and Jeff Denny, VTNA's district manager for Oregon, called May from Strong's office to discuss the letter and draft agreement. The parties discussed one paragraph that had been a source of disagreement, the details of which are not necessary to describe. Strong and Denny told May that, if plaintiff would yield the point, the parties had a deal, and Denny told May that if May abandoned the point, he would sign the contract. May agreed, and Strong prepared a final draft of the contract dated July 18, 2003. The final draft listed three parties—plaintiff, TEC, and VTNA—and included a signature line for each.

On July 21, 2003, Strong sent a copy of the draft to VTNA, stating, "Here is our proposal to May that they are signing." In a July 23, 2003, email from Frank Roehrig, VTNA's director of sales, to the company's fleet facilitator and its manager of remarketing, Roehrig included a copy of

the July 16 email from Bell to Strong and said, "Here is what [VTNA's vice-president for sales] & I approved." That same day, Brian Laymen, VTNA's fleet facilitator, sent an email to Bell, Roehrig, and others at VTNA stating that

> "[i]t appears that we have a commitment from [plaintiff] for a three-year purchase program and that is fantastic. It is important that we document in-house 'the deal.' After reviewing * * * Jeff Strong's letter of commitment and the various emails * * * there is a short list of 'open items' which have already been discussed among senior management, but need formal documented approval in-house."

Again, those emails were between VTNA personnel and between VTNA and TEC representatives only; none of the emails were sent to plaintiff.

VTNA ultimately refused to sign the agreement. On July 24, 2003, Bell told Strong that it was withdrawing its proposed support for TEC's end of the deal. VTNA confirmed that in an email from Bell several days later.

### B. *The Cross-Appeal: Document Exchange*

The cross-appeal arises in the context of the trial court's ruling on VTNA's motion to dismiss under ORCP 17 and concerns an exchange of documents following VTNA's decision not to execute the July 18, 2003, contract. Given that we review any findings of fact in support of the trial court's ruling on that motion for any evidence, we state the facts in the light most favorable to the court's ruling.

As we have noted, on July 24, Bell told Strong that VTNA would not support TEC in its proposed contract with plaintiff. On July 28, Bell sent Strong an email confirming that VTNA was withdrawing its support for the agreement and instructing TEC to take no further action on it. Later that same day, May asked Strong to send a copy of the final July 18, 2003, agreement, and Strong faxed May a copy of the agreement. VTNA contends that, during that conversation, Strong told May that VTNA was withdrawing its support for the agreement; May, however, recalls no such disclosure at the time.

Two days later, May signed the agreement and gave it to David Jostad, plaintiff's general counsel. Jostad created

a cover letter, using a draft that he had prepared earlier, on July 25, 2003. The cover letter's date was changed to July 30, and it referred to the July 28 fax of the agreement. Jostad gave the papers to May for the latter's signature. The signed cover letter and July 18, 2003, agreement were then faxed back to Strong at TEC with a hard copy sent by certified mail.

Strong received the fax, but called May to request that it be re-sent, this time without any reference to the fact that the agreement had been sent to May on July 28. May understood that Strong was concerned that it not "appear" that Strong had taken 10 days to get the July 18, 2003, agreement to May. May had Jostad prepare a new set of documents, including a revised cover letter without the reference to Strong having sent the documents on July 28. Jostad's secretary went back to the original draft cover letter that had been prepared on July 25 and that did not contain any reference to Strong's July 28 transmittal of the contract documents. In her "haste," she forgot to change the July 25 date from the original draft, however. Then, when sending the documents by fax, on her own initiative, she changed the fax cover sheet to conform to the July 25 date of the cover letter. The second batch of documents was then faxed to Strong, with hard copies sent by UPS.

## C.  *The Litigation*

When VTNA refused to execute the agreement, plaintiff initiated this action for breach of contract against both TEC and VTNA. The complaint alleged that "[o]n or about July 25, 2003, plaintiff and defendants entered into an agreement whereby plaintiff agreed to buy, and defendants agreed to sell, a minimum of 499 truck tractors for a price of $89,062[.]"

VTNA answered, asserting, among other things, an affirmative defense of the statute of frauds. Plaintiff replied that VTNA should be estopped from asserting the statute of frauds, given that plaintiff, in reliance on VTNA's oral and email representations, had suffered detriment in allowing favorable agreements with another truck manufacturer to lapse.

VTNA then moved to dismiss and for other sanctions under ORCP 17, arguing that plaintiff's claim is predicated on a fraudulent backdating of documents. Following some discovery, plaintiff amended its complaint to allege that the contract was formed on or about July 18, 2003, not July 25, as had been originally alleged. Undeterred, VTNA pursued its ORCP 17 motion. According to VTNA, the linchpin of plaintiff's breach of contract claim is that, as alleged in the original complaint, the parties entered into a contract on July 25, 2003, *before* Strong told May that VTNA was not going forward with the deal, on July 28. VTNA contended that the fraud was made plain by the fact that, on July 30, 2003, after plaintiff sent TEC an executed copy of the agreement with a cover letter of the same date, it later re-sent the same documents with a different date, July 25. VTNA argued that plaintiff's explanation that the change in the date was inadvertent is simply not credible.

The trial court denied VTNA's motion. The court determined that ORCP 17 does not authorize the dismissal of an action. In addition, the court found that "the facts in this case do not support a finding that plaintiff made a false certification or committed wanton misconduct." The trial court determined that the relevant events occurred in the following manner:

"Defendant TEC through its agent Jeff Strong, on July 24, 2003, received verbal notice of defendant VTNA's withdrawal of support for the agreement between plaintiff and defendant TEC. Strong received, via email, written notice of defendant VTNA's support withdrawal on July 28, 2003. On July 28th, Strong faxed a copy of the agreement to Mr. May for his signature. On July 30, 2003, May signed the faxed copy which bore a fax header dated July 28, 2003 and faxed it back to Strong along with a delivery schedule dated July 30, 2003 and a cover letter dated July 30, 2003, indicating he had received the agreement on July 28, 2003. Later that same day, July 30, 2003, Strong called plaintiff and asked him to re-fax the documents. The parties offer conflicting testimony regarding the substance of the telephone conversation between Strong and May, on July 30, 2003, and the motive for the resulting action. The evidence shows that soon after this phone call, plaintiff re-faxed a signed copy of the agreement with the July 28, 2003 fax

headers removed, a delivery schedule dated July 25, 2003, but bearing a footer dated July 30, 2003, and a cover letter dated July 25, 2003, which omitted the language 'which was faxed to me on July 28, 2003.' The court finds that this does not establish by clear and convincing evidence that plaintiff knew on July 30, 2003, that defendant VTNA had withdrawn its support and in response plaintiff wantonly altered the agreement in an attempt to defraud or force defendant VTNA to support the agreement."

Following the denial of the motion to dismiss, VTNA and TEC moved for summary judgment on the merits, arguing that the undisputed evidence shows that the parties never reached an agreement on all material terms and that, in any event, any agreement was barred by the statute of frauds because of the lack of a signed writing evidencing the intention of the parties to be bound by an agreement. Plaintiff argued that the exchange of emails sufficed to satisfy the writing requirement of the statute of frauds. In the alternative, plaintiff argued that defendants should be estopped from asserting the statute of frauds and that, in any event, representatives of TEC had authority to sign for VTNA.

The trial court rejected the parties' contention that they never reached an agreement on all material terms; the court concluded that there existed at least a genuine issue of material fact on that question. The court further rejected the statute of frauds as to TEC. According to the court, there existed an issue of fact as to whether Strong, in sending the agreement on TEC letterhead, had intended, in effect, to authenticate the agreement, as if by a signature. As for VTNA, however, the court concluded that there was a complete lack of evidence of a signed writing indicating VTNA's agreement to the deal and a lack of evidence that TEC had authority to sign for VTNA. The court granted VTNA's summary judgment motion and dismissed it from the case.

The case then went forward against TEC. After an eight-day trial, the jury found for plaintiff in the amount of $3.14 million. The court entered judgment on the verdict. The general judgment stated that "prejudgment interest, if any, and costs shall be awarded by the court in a supplemental judgment upon application by the plaintiff and briefing by the parties."

Plaintiff filed an application for prejudgment interest in the trial court. Subsequently, plaintiff and TEC entered into a settlement agreement under which TEC agreed to pay plaintiff $2.9 million in full satisfaction of the judgment. The parties agreed to request that the trial court "withhold any decision on [plaintiff's] pending application for pre-judgment interest." Plaintiff obtained TEC's agreement not to oppose plaintiff's pending application for prejudgment interest. The settlement agreement provided that, "[u]pon payment of said amount, plaintiff shall satisfy, in full, said judgment, including principal, costs, prejudgment and post-judgment interest." Finally, the settlement agreement reserved plaintiff's right to challenge on appeal the trial court's summary judgment ruling on the claim against VTNA.

Following TEC's payment of the settlement amount, plaintiff's counsel sent the trial court a letter reminding it of plaintiff's request for prejudgment interest. The letter acknowledged that the judgment had been fully satisfied and that "[s]ince the judgment has been satisfied, I will not submit a supplemental judgment." The letter also noted that, pursuant to the settlement, TEC had agreed not to oppose the request for prejudgment interest. TEC, in fact, did not oppose the request. VTNA did object, however.

While the parties debated prejudgment interest, plaintiff appealed the dismissal of VTNA on its summary judgment motion. VTNA cross-appealed, assigning error to the trial court's denial of its motion to dismiss and for other sanctions under ORCP 17.

Following the filing of the notice of appeal, the trial court granted plaintiff's motion and entered an order awarding plaintiff prejudgment interest of $249,093.

## II. ANALYSIS

### A. *VTNA's Motions*

VTNA asserts that the appeal should be dismissed, on two grounds. First, VTNA asserts that, when plaintiff satisfied the judgment against TEC on the breach of contract claim, plaintiff's claim was extinguished with respect to all remaining contract obligors. In support of that assertion,

VTNA relies on *Cooper v. Sagert et al.*, 111 Or 27, 33, 223 P 943 (1924), in which the court held that, although a creditor may obtain separate judgments for the same debt against separate parties jointly liable, it may have only one satisfaction of judgment, and that a complete satisfaction of the judgment against one debtor operates in law as a satisfaction and discharge of all other jointly liable debtors. *See also Starr v. Heckathorne*, 270 Or 238, 240, 527 P2d 401 (1974) (judgment creditor entitled to only one satisfaction of his judgment against joint tortfeasors). Assuming that the holding in *Cooper* remains good law, *but see Schiffer v. United Grocers, Inc.*, 329 Or 86, 100, 989 P2d 10 (1999) (release of one joint and several obligor on a promissory note does not release automatically the other joint and several obligors), we reject VTNA's contention that the satisfaction of plaintiff's judgment against TEC extinguished its claim against VTNA. Unlike in *Cooper*, plaintiff's breach of contract claim in this case did not allege the joint liability of VTNA and TEC, and plaintiff's satisfaction of the judgment against TEC does not prevent plaintiff from pursuing an appeal on its claim against VTNA for its separate contractual obligation.

■ Second, VTNA asserts that plaintiff's appeal should be dismissed because it puts at risk plaintiff's judgment against TEC. Citing *Pac. Gen. Contrs. v. Slate Const. Co.*, 196 Or 608, 611, 251 P2d 454 (1952), VTNA asserts that a party may not claim the benefits of a judgment and at the same time appeal from it. VTNA contends that, if plaintiff is successful in obtaining a reversal of the trial court's summary judgment ruling on the claim against VTNA, then plaintiff and VTNA will relitigate VTNA's liability for the alleged breach of contract and plaintiff's damages from the alleged breach, thereby giving rise to the possibility that plaintiff's damage recovery will be reduced. Having accepted the benefits of the judgment against TEC, VTNA asserts, plaintiff cannot maintain this appeal, potentially putting the previous judgment at risk.

The short answer to VTNA's contention is that plaintiff is not appealing the judgment against TEC. That judgment is final, and any judgment against VTNA after a trial on remand would not affect the judgment against TEC or put

it at risk. In appealing the judgment in favor of VTNA, plaintiff is not taking a position inconsistent with its judgment against TEC. In any event, our affirmance of the judgment dismissing VTNA renders the question academic.

■    VTNA contends that, even if we reject its motion to dismiss the appeal, we nonetheless should strike the trial court's order awarding prejudgment interest to plaintiff on its claim against TEC. VTNA asserts that, after the notice of appeal had been filed, the appellate court acquired jurisdiction of the appeal under ORS 19.270, and the trial court lacked jurisdiction to enter an order in the case that did not relate to one of the matters authorized by ORS 19.270(1) or ORS 19.270(5). VTNA asserts that the trial court's order awarding prejudgment interest does not fall within either category.

VTNA's argument is correct as far as it goes. However, plaintiff appealed only the part of the judgment dismissing VTNA, not the part of the judgment awarding plaintiff damages against TEC. The trial court did not lose jurisdiction over the portion of the litigation that was not involved in the appeal. *State ex rel Gattman v. Abraham*, 302 Or 301, 306-11, 729 P2d 560 (1986) (*former* ORS 19.033(1) (1986), *renumbered as* ORS 19.270 (2003), giving appellate court "jurisdiction of the cause" is not intended to oust trial court of jurisdiction of those parts of the litigation which are not directly involved in the appeal). Plaintiff and TEC had stipulated that plaintiff's request for prejudgment interest would be stayed pending settlement, and further agreed that, if TEC paid the settlement amount, TEC would not oppose the award of prejudgment interest. The portion of the judgment relating to TEC was not on appeal, and VTNA was not a party to the court's order awarding prejudgment interest. We conclude that the filing of the notice of appeal did not deprive the trial court of jurisdiction to enter an order relating to that part of litigation not involved in the appeal.

B.  *The Appeal: Statute of Frauds*

We turn to the merits of the appeal. As we have noted, plaintiff alleged that, on or about July 18, 2003, plaintiff and defendants entered into an agreement whereby

plaintiff agreed to buy and defendants agreed to sell a minimum of 499 trucks for a price of $89,062 each, and that defendants breached the agreement. Defendants responded that no such agreement came into being because of, among other things, a failure to comply with the statute of frauds, specifically, the absence of a signed writing indicating their agreement. Plaintiff responded that the various emails that were exchanged were sufficient to satisfy the writing requirement. In the alternative, plaintiff argued that TEC had authority to sign for VTNA and effectively did so and that, in any event, VTNA should be estopped from invoking the statute of frauds. The trial court concluded that, as to VTNA, the case must be dismissed for want of compliance with the statute of frauds. On appeal, plaintiff essentially reprises the arguments that it advanced to the trial court.

■    Summary judgment is appropriate if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. ORCP 47 C; *Robinson v. Lamb's Wilsonville Thriftway*, 332 Or 453, 455, 31 P3d 421 (2001). There is no genuine issue of material fact if no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment. *Garrison v. Deschutes County*, 334 Or 264, 266, 48 P3d 807 (2002).

■    In this case, the disputed issue is the enforceability of the supposed agreement with VTNA. Whether an agreement is enforceable is a question of law. *Key West Retaining Systems, Inc. v. Holm II, Inc.*, 185 Or App 182, 188, 59 P3d 1280 (2002), *rev den*, 335 Or 402 (2003). Under the statute of frauds, certain contracts must be evidenced by a signed writing to be enforceable. The parties agree that, because the supposed contract in this case was for the sale of goods for the price of $500 or more, it is subject to Oregon's Uniform Commercial Code and its statute of frauds, which is found at ORS 72.2010(1) and provides:

"Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by the authorized

agent or broker of the party. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing."

The statute of frauds is considered to be an affirmative defense, which must be specially pleaded. *GPL Treatment, Ltd. v. Louisiana-Pacific Corp.*, 323 Or 116, 122, 914 P2d 682 (1996). The party raising the statute of frauds also has the burden of proving it. *Id.* To avoid a statute of frauds defense under ORS 72.2010(1), there must be some writing sufficient to indicate that a contract for sale has been made between the parties. *Id.* The writing must be signed by the party against whom enforcement is sought. *Id.* Whether documents are sufficient to satisfy the statute of frauds is also a question of law for the court. *Id.* at 121; *Com. Credit Corp. v. Marden*, 155 Or 29, 39, 62 P2d 573 (1936); *McInnis v. Lind*, 198 Or App 139, 145, 108 P3d 578 (2005) (whether a note or memorandum is sufficient to satisfy the statute is a question of law).

ORS 71.2010(2)(kk) (2009) provides that the term "signed" for purposes of the statute of frauds "includes using any symbol executed or adopted with present intention to adopt or accept a writing." The official comment to Uniform Commercial Code Section 1-201 (ORS 71.2010(2)(kk)) states that the definition of "signed"

> "makes it clear that, as the term 'signed' is used in the Uniform Commercial Code, a complete signature is not necessary. The symbol may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead. No catalog of possible situations can be complete and the court must use common sense and commercial experience in passing upon these matters. The question always is whether the symbol was executed or adopted by the party with present intention to adopt or accept the writing."

ULA UCC § 1-201, Comment 37 (2004).

We also note that, under the Uniform Electronic Transactions Act, ORS chapter 84, an electronic document may be "signed" by electronic signature, which "means an

electronic sound, symbol or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." ORS 84.004(8).

■     In this case, there is no handwritten signature by or on behalf of VTNA. The question is whether the various emails by which the parties carried on their negotiations were sufficient to satisfy the signature requirement. In particular, plaintiff relies on the July 16, 2003, email from Bell, representing VTNA, to Strong, representing TEC, which summarizes the points to which the parties "agreed." According to plaintiff, the email "To" and "From" heading, with names in the appropriate positions, and Bell's initials, "RB," at the end, are Bell's signature on behalf of VTNA.

We need not decide whether those marks are signatures within the meaning of the statute of frauds. The critical issue is whether the signature evidences an intention of the party to be bound by the agreement. *Com. Credit Corp.*, 155 Or at 38 (the signature of the party to be bound, regardless of where it appears on the document, constitutes a sufficient signing, if it is written for the purpose of giving authenticity to the instrument). In this case, even if the heading and the initials at the end of Bell's July 16, 2003, email *could* constitute a signature for statute of fraud purposes, in this case, they do not. To begin with, the emails are between representatives of TEC and VTNA; it is undisputed that plaintiff did not receive a copy of the emails until after this litigation commenced. It is difficult to understand how emails to which plaintiff was not even a party satisfy the requirement of a signed writing evidencing an intention to be bound to an agreement *with plaintiff*. Apart from that, the content of the emails clearly indicates that VTNA did not intend to be a party to any agreement with plaintiff. As we noted above, Bell's July 16, 2003, email stated that TEC should prepare its own "signed agreement with the customer that the dealership place an order for units to be built" during the following two calendar years. Even more clearly, the email cautioned that "VTNA's support for this transaction is to TEC Equipment, not the customer. You will have to prepare your agreement with [plaintiff] based upon the support we are providing you."

■ Plaintiff contends that, if the emails are not sufficient to satisfy the statute of frauds, the July 18, 2003, draft agreement is. According to plaintiff, the fact that the draft agreement was printed on TEC letterhead is the key. That letterhead, argues plaintiff, satisfies the signed writing requirement. We are aware of decisions from other jurisdictions holding that letterhead symbols may be sufficient to satisfy the statute of frauds. *See, e.g., Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F2d 1178, 1185 (7th Cir 1991); *First Valley Leasing, Inc. v. Goushy*, 795 F Supp 693 (DNJ 1992). Oregon courts have yet to address the issue. We need not do so in this case, however. Even assuming that printed letterhead can constitute a signed writing for statute of frauds purposes, in this case we remain unpersuaded that the letterhead of *another party*, TEC, satisfies the requirement that *VTNA* have signed a written agreement.

Plaintiff argues that, aside from the TEC letterhead itself, there is also the fact that the form of agreement printed on that letterhead included a signature line for VTNA. As we understand plaintiff's argument, it is that, because it is possible that Denny, VTNA's district representative, knew that TEC had prepared the July 18, 2003, document with a signature line for VTNA, it may reasonably be inferred that VTNA authorized TEC to do so, which suggests that VTNA intended to sign the agreement.

Assuming that there is evidence that Denny knew about the form of the agreement, and assuming further that the mere fact of that knowledge permits an inference that Denny approved of the inclusion of a signature line for VTNA, plaintiff's argument founders on two grounds. First, plaintiff cites no authority—and we are aware of none—that stands for the proposition that an *unsigned* signature line is itself a "signature" for statute of fraud purposes. The very fact that there is a signature line would, in and of itself, seem to defeat the inference that the parties did not intend that an actual signature was necessary. Second, even assuming that an unsigned signature line could constitute a signature, plaintiff's argument depends on the assumption that Denny had authority to commit VTNA to the agreement. Plaintiff offers no evidence of Denny's actual authority to do that

beyond what it characterizes as the "tenor" of the emails over the course of the first half of 2003.

Plaintiff insists that the evidence creates at least a genuine issue of material fact about whether Denny had *apparent* authority to commit VTNA based on the fact that Denny had participated in a number of the negotiations and that VTNA never said that it would not be a party. Moreover, plaintiff contends, Denny told May that, if plaintiff would abandon a disputed point, he would sign the agreement. The problem with plaintiff's argument is that, at best, it demonstrates that Denny had apparent authority *to sign* for VTNA, when it is undisputed that he did not actually sign the agreement.

Finally, plaintiff contends that, if nothing else, VTNA should be estopped from asserting the statute of frauds because, in entering the agreement, plaintiff relied on VTNA's representations to its detriment. In support, plaintiff contends that, over the course of the negotiations, it let expire advantageous repurchase agreements with its existing supplier, in the expectation that VTNA would be supplying the replacement trucks.

Under Oregon law, equitable estoppel may provide grounds to avoid a statute of frauds defense, including in cases arising under the Uniform Commercial Code. *Potter v. Hatter Farms*, 56 Or App 254, 260-63, 641 P2d 628 (1982). In *Conklin v. Karban Rock, Inc.*, 94 Or App 593, 767 P2d 444, *rev den*, 307 Or 719 (1989), however, this court held that a party asserting estoppel to avoid the statute of frauds must show that the party asserting the statute of frauds made a misrepresentation "beyond the contractual promise itself" and gained an advantage from the misrepresentation and detrimental reliance. *Id.* at 597-98. Plaintiff disputes the correctness of *Conklin* and its analysis of prior case law. We decline, however, to revisit that decision.

In light of *Conklin*, plaintiff cannot succeed in relying on estoppel to avoid the statute of limitations. To begin with, it is doubtful that plaintiff has established detrimental reliance. Plaintiff, as the party opposing VTNA's motion for summary judgment and asserting promissory estoppel, has

the burden of offering admissible evidence to create a genuine issue of material fact on that point. *O'Dee v. Tri-County Metropolitan Trans. Dist.*, 212 Or App 456, 463, 157 P3d 1272 (2007) (nonmoving party has the burden of offering admissible evidence to create a genuine issue of material fact on any issue raised in the motion as to which the nonmoving party would have the burden of persuasion at trial). In this case, that would require some proof that, between July 18, 2003—the date that plaintiff contends VTNA entered into the agreement—and August 5, 2003—the date that plaintiff contends VTNA told it that it was backing out—plaintiff let its favorable existing repurchasing options expire. There is simply no evidence that, during that 17-day period, such detrimental reliance occurred.

Moreover, plaintiff cannot establish that the reason for its reliance was a misrepresentation of some fact other than the contractual promise itself. Plaintiff relies solely on what it contends is the oral promise to enter into the agreement to sell trucks; it identifies no other misrepresentation on which it relied to its detriment. Under *Conklin,* that is fatal to plaintiff's reliance on estoppel to avoid the statute of frauds.

C. *Cross-Appeal: ORCP 17 Sanctions*

In its cross-appeal, VTNA asserts that the trial court erred in denying its motion for dismissal and other sanctions under ORCP 17. As we have noted, the trial court concluded that ORCP 17 does not authorize the dismissal of an action. In addition, the court found that VTNA had failed to prove the factual predicate for consideration of sanctions under that rule. On appeal, VTNA argues that the trial court erred in both respects.

ORCP 17 provides, in part:

"C(4)   A party or attorney certifies that the allegations and other factual assertions in the pleading, motion or other document are supported by evidence. Any allegation or other factual assertion that the party or attorney does not wish to certify to be supported by evidence must be specifically identified. The attorney or party certifies that the attorney or party reasonably believes that an allegation or

other factual assertion so identified will be supported by evidence after further investigation and discovery.

"* * * * *

"D(1)   The court may impose sanctions against a person or party who is found to have made a false certification under section C of this rule, or who is found to be responsible for a false certification under section C of this rule. * * *

"* * * * *

"D(4)   Sanctions under this section must be limited to amounts sufficient to reimburse the moving party for attorney fees and other expenses incurred by reason of the false certification, including reasonable attorney fees and expenses incurred by reason of the motion for sanctions, and upon clear and convincing evidence of wanton misconduct amounts sufficient to deter future false certification by the party or attorney and by other parties and attorneys. The sanction may include monetary penalties payable to the court. The sanction must include an order requiring payment of reasonable attorney fees and expenses incurred by the moving party by reason of the false certification."

As we explained in *Sinio v. Bledsoe*, 172 Or App 254, 259, 18 P3d 410, *rev den*, 332 Or 305 (2001), the rule authorizes sanctions if a court finds that a party has made "false certification" to the court. Once a court determines precisely what was certified, the question is whether there exists evidence to support the assertion. *Id.* It bears some emphasis that

"the issue is not whether the factual assertion is correct. Rather, the question is whether the person making the allegation or assertion reasonably believed that there either was or would be some evidence to support the assertion."

*Id.*

In this case, as we have noted, VTNA contends that plaintiff and its counsel made a false certification to the court when the complaint alleged the formation of a contract on July 25, 2003. According to VTNA, the factual record shows that no such agreement occurred on that date and that, in fact, plaintiff fraudulently backdated documents in order to support the allegation that an agreement took place on July 25, before VTNA disclosed that it was not going forward with

the deal. The trial court, as we have also noted, found that VTNA failed to establish that plaintiff or its counsel engaged in false certification, because there was evidence in the record sufficient to form a basis for their reasonable belief in the accuracy of the facts as pleaded.

On appeal, VTNA contends that no reasonable person could rely on the evidence that was known at the time of the filing of the complaint and assert that a contract had been formed on July 25, 2003. We reject VTNA's contention.

At the outset, we find it difficult to resist the observation that VTNA has expended an extraordinary amount of ink and effort to complain about the fact that the complaint may have erred by a matter of seven days in identifying the date that the agreement arguably was formed. It is hard to imagine—particularly if VTNA is correct that the record so clearly suggests the error—how VTNA was harmed by the mistake and why it justified the vigor with which VTNA has pursued sanctions against plaintiff and its counsel.

On the merits, the evidentiary record certainly permits an inference that TEC and plaintiff attempted to backdate the contract documents on July 30, 2003, as VTNA contends. There is evidence that, on July 28, 2003, Strong told May that VTNA was backing out of the deal, and it is clear that a second set of documents was thereafter sent under an earlier date.

But that is simply beside the point. As we have noted, the point is whether there is evidence from which plaintiff and its counsel reasonably could arrive at a different narrative. In this case, as the trial court ably recounted, the evidence is sufficient to do just that. The fact is that there was evidence that Strong did not tell May that VTNA was not going forward with the deal until August 5, 2003. Moreover, there is evidence that the dating of the document was an inadvertent clerical error. The fact is that, at the time of the filing of the complaint, there did exist documents showing that a contract had been signed on July 25, 2003, and, under the circumstances, we decline to say that it was objectively unreasonable for plaintiff to rely on those documents in, at least initially, alleging the date of contract formation. (As we have noted, plaintiff later amended the complaint to allege

that the contract was formed on July 18, 2003, and VTNA makes no argument that there is insufficient support for that allegation for the purposes of ORCP 17.)

Because we conclude that the trial court did not err in evaluating whether plaintiff and its counsel made false certification to the court, it is not necessary for us to address whether ORCP 17 authorizes dismissal or other sanctions in this case.

Motions to dismiss appeal and to strike trial court's order granting prejudgment interest denied; affirmed on appeal and on cross-appeal.